Good morning. I'm Richard Levine for Appellant William Hunt. I'd like to reserve a few minutes for rebuttal. So please watch your clock. It goes down. So you start with your 15 minutes. You can start them back at 15 minutes. And then it drops down. So when you want to reserve time, you know you're running out of time. Thank you. As courts are aware, this is a case where the appellant filed a civil rights action against the respondents, the county, and then-Sheriff Corona, respecting retaliation arising from action taken against my client for campaign statements Hunt made in the election against the then-incumbent Sheriff Corona. We believe that the district court erroneously granted the motion for judgment, where it concluded that Hunt was a policymaker under the Edward Grant exception of the First Amendment. Although we're certainly not contending that each and every one of the 37 responses by the jury interrogatories necessarily favored Hunt, but what we are saying is with respect to the majority of those findings were favorable to Hunt, and we believe that a reasonable review of all of the responses to the interrogatories in their totality does not support a conclusion that Hunt was a policymaker. Well, the jury found that he was a policymaker as to San Clemente, not department-wide, but as far as San Clemente, he was a policymaker. Isn't that right? Right. Well, it was mixed in that regard. In some cases they say he didn't have substantial influence on modifications of department policies, and in others they said, yes, he had impact in terms of the development of policies that affected San Clemente, and that really goes to our concern that- Well, he didn't-they also found that he didn't even formulate policy for San Clemente. All he did was they did find that he substantially influenced policy-affecting, but not that he could make policy. But isn't-I mean, I think both sets of briefs as well as the district court are-and even the way these findings were written- are using policymaker as a literal term, policymaker, when in fact the Supreme Court has instructed that policymaker isn't used in its sort of ordinary terms, but it's-what it means is that-or what the real question is whether the hiring authority, which would be the Orange County sheriffs, can demonstrate that party affiliation, that political affiliation is a requirement of the particular job that is being held. And when I read this case, when I read the findings of fact, you know, to me they don't seem to- the real question isn't asked. Is party affiliation essential or even necessary to being the police officer in charge of operating the San Clemente Department? Well, that's really the ultimate question, and obviously the Ninth Circuit and other courts have looked at certain indicia of whether or not a position does require political loyalty, and we're all aware of what those factors are. This Court set it forth in Fazio, and if you look at those factors, or even the factors that the U.S. Supreme Court has addressed, such as trust and confidence, well, the jury clearly said trust and confidence was not necessary for Hunt's position with respect to his relationship with Corona. If you look at the Elroy case where it talks about an advisor, whether or not the subject in play was an advisor to the official, the jury said Hunt was not an advisor to the sheriff or even assistant to the sheriff. You know, those are, you know, I think those are pretty fundamental indicia of what a policymaker is. The Fazio court and other courts have talked about whether or not a job description is vague. Obviously, the more vague it is, the greater chance there is for someone to be a policymaker, and this jury found that Hunt's job description was not vaguely worded and that his job responsibilities were restricted to implementation of the sheriff's department's rules and regulations. With respect to so-called speaking on behalf of the official, that's a classic Fazio factor. The jury interrogatory responses, I think, touch on that. The jury said that, found that Hunt did not have the authority to speak to the media without prior approval of higher ranking officers or the department's public information officer. That's a far- Wasn't he the voice or the face of the department, though, in San Clemente? He was, but I respectfully submit, Your Honor, that, and I know this might be a dramatic example, but even a deputy that goes to a neighborhood watch meeting is really the face of the department to those people he's speaking to. And, but I think when it comes down to what he's authorized, Hunt's authorized to do in terms of his job as police services chief, the jury clearly found that he was not supposed to talk to media without prior approval. And that's a far cry from some of these other cases where the subject employee really has full authority to speak on behalf of the department. How do you distinguish the Barczyk case from this case? Right. Well, the Barczyk, the Barczyk case, the court applied the classic Fazio elements, and the court of appeal in the Barczyk case found that Barczyk did not have vague job responsibilities. Therefore, the implication is that he was more likely a policymaker. In terms of formulation of policies, the Barczyk case found that Barczyk formulated department-wide, well, several operational changes, policies in the department. But he had a specific assignment, just like your client did. They were different. I mean, his were over-reserve officers, if I recall correctly. Is that right? Right. And your client was over St. Clemente. Right. But the distinction, I think, that the Barczyk case found is that Barczyk was in charge of reserves that spanned the whole department. There were 600 reserves. And that's why Barczyk developed a decentralization program for reserves, which consequently I think the Barczyk court interpreted as a kind of an organic department policy it was trying to change. Well, he was given a very broad discretionary instruction, too, right? Wasn't he supposed to clean up the reserves? Clean up. And in our case, the record's clear and the jury so found that Hunt did not have, you know, regular kind of contacts or frequent contacts with the sheriff, which the Barczyk court, Barczyk absolutely did, at least for the first period of his term as reserve division commander. So I think those distinctions are extremely important. I think there are distinctions. I also don't agree. I agree with Judge Fragerson's dissent in that case. So I think there are distinctions from this, from your case. But I'm also, I mean, I could see how Barczyk was more of a, or his political affiliation when he was given this broad-ranging authority over, you know, department-wide reserves is different than one small geographical area. I see that. I also don't agree with the decision itself. But there's something we can do about that. And in terms of other traditional FASIO factors, as the courts are aware, one is relative technical competence. And there is a finding by the district court that that factor didn't weigh for or against the finding of political loyalty. And there was another one, whether or not on relative pay, whether or not Hunt made so much more than anyone else. And the court found that it was neutral in that respect. With respect to influence on programs, and that's a traditional FASIO factor, that's a very problematic one because the jury specifically found Hunt had influence on San Clemente programs. But he had no political loyalty to San Clemente. That wasn't his employer. The whole point of the policy-making exception is to make sure that the will of the electorate who voted in the officials' policies are done, policies are implemented. Whether or not the city council of San Clemente had a no-smoking ban on the beach or agreed to a conditional abuse permit for an addition of a restaurant has nothing to do with Corona's policies. And I think some of the formulation of the jury instructions, regrettably, obscured that difference. Also in Bardzig, it did say that the FASIO factors are not exclusive. And they found this part of the decision somewhat perplexing, that they found that Bardzig actively sought to undermine the sheriff's policies. And one of them was a policy that was later found to be corrupt, which was the policy that Corona had in issuing badges to his cronies in violation of the law. So I guess there are other factors you can consider, but I don't quite understand how this decision decided that undermining the sheriff's policy of doing something that violated the law. Maybe we're asking the wrong question of the wrong council. I think you might be. So that might be. I had a section where I briefed whether or not it's a vital governmental interest to suppress speech concerning corruption in government. And the Bardzig case found differently. But I think the court still needs to harmonize the need for the electorate to be aware during election campaigns of corruption. And I think that interest is as important as making sure that the incumbent's policies. Well, how can we harmonize this case with Bardzig? I mean, we've got Bardzig sitting there. Is that – and I realize it's a panel decision. It's not en banc, but is that binding on us? How can we harmonize the decision in this case with Bardzig? Right. Well, I think one easy way to is the Bardzig case similarly applied to the traditional FASIO standard condition – factors. And I think it's fact-specific, and I think our facts are different in important ways than Bardzig. And I think the Bardzig case can be distinguished on the facts in this particular case. I really do. Because, after all, the courts have said time and time again that you have to look to the actual duties. And that's the key. And titles are meaningless. As a matter of fact, what if we had a title in Hunt's case that he was, instead of the name of chief of police services, it was like watch commander for San Clemente? I don't even think we'd be here discussing policymaker because everyone just assumed that, well, you know, he's just a watch commander. And what's – I'll leave myself a few moments, but what's interesting is even under the department rules and regulations, the job description, this is in the police department, in the sheriff's department's own manual, the duties and responsibilities of lieutenant are identical to chief of police services. So, anyway, thank you very much. Thank you. Thank you, counsel. May it please the court. Warren Watkins on behalf of Lee. These cases arise always in a very difficult context, but the fact of the matter is, and what the decisions of the courts have recognized, is that whether we call it policymaker, political loyalty, the team, we all recognize and the Supreme Court has recognized that elected officials, governmental officials, high officials are entitled to have people loyal to them in a political sense as their cabinets, so to speak. But not to the extent that their corruption occurs and these people aren't going to report it because they're my cronies, right? I mean, what's the line here? Well, you know, this is an extremely important and difficult notion to wrap your arms around. This court faced it as far back as Fazio, in fact, comments in the Fazio decision. If we were to carve an exception for whistleblowing speech, so to speak, think about the ramifications. The ramifications would be the easiest way to get job security is to accuse your boss of corruption, illegal conduct, whatever. And the decisions of this court from Fazio and Biggs and Barczyk, expressly in Barczyk, made clear that the policymaker analysis does not take a content of the speech into consideration. But here, I mean, it's not like a whistleblower. I recall Barczyk and Mr. Hunt as well were candidates for office, right? They were running against him saying, well, I can do a better job than he can. Hunt was a candidate Barczyk actually supported on. Oh, that was, I beg your pardon, exactly right. That's correct. Exactly right. And that's correct. And like any political campaign, it got heated and rhetoric was. . . Right, so it's not whistleblowers, but it's, I mean, there's some interest in the First Amendment with having confident people run for office. Absolutely. I mean, despite the, well, never mind. No, that's absolutely correct. And that's where Elrod and Branky all got started. Where do we draw the line? Where do we draw the line? But the problem with the Fazio factors, I mean, if you look at them, technical competence. What does that have to do? So if I'm your good police officer, I'm not so competent. Fazio doesn't apply to me because I'm not competent. I mean, some of these things, as Judge Wardlaw said from the beginning, this is political. I mean, you go back to Brant and Elrod, where political affiliation is an appropriate requirement for the performance of the job. So if I'm elected president or whatever, and so I appoint people who are going to be my advisor, my assistant to the president or whatever, blah, blah, blah, and those are political appointments. But this gets now into, and we're talking about officers that are actually watch commanders, in effect, or whatever. They're actually implementing policy. And we've gotten away from it. It seems to me like the Fazio factors and Barczyk take us away from that consideration, from the base. Fazio, in fact, the district court opinion in this case, traces the history of those factors, not just to this circuit, but in every circuit. Yeah, she does, doesn't she? In a very scholarly way. All of her opinions are like that. It's interesting reading, and I've read most of those cases. And, for example, the technical competence, what you're looking there, not so much is it a competent versus an incompetent, but is this a person that has unique or technical skills that render them invaluable to the elected officials' goals and aspirations? The phenomenal question, really, and it comes from Fazio, is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved. And so that's why we look at Hunt's duties, which were different than Barczyk's, and determine whether political considerations are appropriate requirements for the performance. And I think instead of answering that question, what's happening, in some of the cases, is this is the issue, and then the court will just mechanically apply the Fazio so-called factors without the direction of the ultimate determination, which is, was political affiliation required for Mr. Hunt's job? So tell me, you know, what in the record, what findings in the record would show that, would meet your burden of showing that? Yes. First, the case law makes clear that the reference in the description of political affiliation doesn't mean literally Republican-Democrat political affiliation. No, no, no, it doesn't. Right. It's a broader loyalty kind of concept. Well, in this context, though, it's running against him. It doesn't matter if he was Republican or Democrat. It's just that he ran against him. Understood. It's just I don't want to get sidetracked into politics. Okay. Well, I know they say political, they use that, but okay. Correct. And the cases are clear on that. Now, the findings of the jury and the analysis of the district court make clear. No, no. Yeah, that's why we have the findings of the jury. What I'm asking you is we have these findings of the jury. Which ones of them support a conclusion that political affiliation was an essential part of Mr. Hunt's performance of his job? The entire analysis of the district court. No, no, no, no. I want you to point to the findings of fact that support that conclusion. That's where I'm headed. The findings, for example, found that within the city of San Clemente, Mr. Hunt was the face of the sheriff's department, was responsible to interact with the city council, with the political leaders within the city, was responsible to discharge and formulate with wide discretion the law enforcement policies within the city of San Clemente, and all as a representative of the elected official, the sheriff. The findings found that Mr. Hunt, as the chief, influenced, broadly influenced policy, law enforcement policy within the city. It was Hunt's choice. Was the law enforcement policy within the city of San Clemente any different than the department-wide policy? Oh, absolutely. For example, Mr. Hunt attended city council meetings. It was Mr. Hunt's decision when the council members would say, we've got problems over on the east side. We'd like to have this or that. Mr. Hunt decided how to allocate police resources. But he didn't change any policy. I mean, he didn't change the department-wide policy. He just, within the parameters of the policy, he would allocate resources. Well, and he's influencing and establishing and formulating policy within the geographic areas of San Clemente. No, I think they didn't find that. He was not allowed to modify. He just implemented, even within that geographical area. He clearly could not modify departmental rules, regulations, and so forth. There's no question about that. But he formulated plans, and the jury found. And the court noted that he formulated plans to implement the broad goals of the department within the city of San Clemente. He was. In fact, he described it. It was like running a mini-sheriff's department, being the chief of police in San Clemente. Sam had a hard time, since he couldn't really change the overriding policy. And he definitely didn't advise anybody about it. And his job was, within the city of San Clemente, to make sure that policy was implemented. And, yes, he'd have to make day-to-day kind of decisions, because, you know, he was sort of the supervisor, manager. I don't see how his political loyalty would have anything to do with doing that kind of job, responding to the city council, allocating resources, managing officers. One of the questions that the courts repeatedly looked to, and that the district court did in this case, is, is he in a position where, if he chose to do so, could he foot drag, could he delay, could he make more difficult the sheriff's, you know, fulfillment of whatever the sheriff's mission is for the county? And, clearly, the district court found he could, as the chief of police of San Clemente. He was clearly in that type of a position, that he could, if he was so inclined, be a very big impediment to the fulfillment of the elected official's responsibilities. Now, the Supreme Court... What about these jury findings? These seem to go directly contrary to that argument. Was defendant Michael Karuna's trust and confidence in plaintiff William Hunt necessary to plaintiff's ability to perform his job in the OCSD? No. Was the captain's trust and confidence in plaintiff William Hunt necessary to plaintiff's ability to perform his job in the OCSD? No. Was the assistant sheriff's trust and confidence in plaintiff William Hunt necessary to plaintiff's ability to perform his job in the OCSD? No. Those are 35 through 37. Yes. And then if you – there are 37 questions, and the jury answered 37 questions, and as the – There were 78 that were proposed between the two sets of interrogatories. Yes. And the district court analyzed all of the responses. And, for example, in our brief, we point out some significant responses of the jury. If I have one moment to back them down here. The jury found that Mr. Hunt did have broad responsibilities all within the city. And that – and, frankly, that was one of the bones of contention in the district court. And the district judge, I think, correctly said, look, his sphere of influence is limited geographically. And that's – there's no question about that. There's no dispute about that. But within that geographic – The question I was – the facts, the findings of facts, and you can't disregard the findings of facts by the jury, that go to the question of whether it was necessary for – I mean, I guess it's the converse or the inverse of the question that, oh, he could drag his feet or something. And the answers came back saying, well, really, he couldn't because he didn't – the trust and confidence of all these upper-level people weren't really necessary for him to perform his job. Basically, it was more ministerial. He's implementing the policy as opposed to doing something that could undermine their trust and confidence. And then when you get to the second special set of interrogatories, they're asked, did the statements made by Plaintiff Gordon Hunt referenced in the notice of pending demotion, which is the campaign speech, cause an actual material and substantial disruption in the efficient operation of the Orange County Sheriff's Department? And they say no. And then the next question says, if your answer is no, did Defendant Michael Corona reasonably predict that the statements made by Plaintiff William Hunt that are referenced in the notice of pending demotion would cause an actual material and substantial disruption in the efficient operation of the OCSD? They say no again. You can't even predict based on what the basis for his demotion was that there would be any disruption. As we point out, those are all questions that are directed by the Pickering balancing. They are all Pickering balancing questions. This Court has repeatedly said that if it's a policymaking position, there is no Pickering balancing that is done by the jury. Well, why did you submit these to the jury then? I mean, you agreed to submit these questions to the jury, and they made the bindings. You'll note a footnote in her opinion wherein the defendants did not submit any Pickering questions because of the decisions of this Court and... But if Pickering was off the table, why were these questions submitted? I mean, I think she acknowledges in her opinion, and it makes no mention of Pickering. And, in fact, we point out in our brief that this Court and Barczyk made very clear that there is no place for Pickering balancing. I agree with that. Once you've found a policymaker. But if you haven't found a policymaker or if you're trying to figure out a policymaker, Pickering analysis does begin. And I would point out, I found these, you know, the jury also found that as chief of police services, did Plaintiff William Hunt exercise discretion regarding how to implement the policies of the Orange County Sheriff's Department in the city of San Clemente? Yes. Did Plaintiff William Hunt substantially influence policy on the Orange County Sheriff's Department for the Orange County Sheriff's Department that affected the city of San Clemente? Yes. Did Plaintiff William Hunt substantially influence modifications of any policy of the Orange County Sheriff's Department that affected the city of San Clemente? Yes. Did Plaintiff William Hunt substantially influence plans to implement the broad goals of the Orange County Sheriff's Department in the city of San Clemente? Yes. Did Plaintiff William Hunt formulate plans... You don't need to read them all. They're all on the record. You don't need to read them to us. But it seems like the most critical factor is the influence on programs, and his influence on programs was nil. I mean, even if you just apply the FASIO factors. Well, I mean, clearly within the city of San Clemente, his influence on programs was almost exclusive. I mean, he was the chief, and that was what the court found, and I think clearly substantial evidence supports that finding. The only other things that I want... Time's up here. Barczyk is important, obviously, in this case. And I think Barczyk takes off the table the least restrictive alternative argument that's made here. It also takes off the table this idea that a vital governmental interest does not exist if the content of the speech is what we would classify as whistleblowing speech. I think you've made all those arguments in your brief, which we've read. And so you're over your time, and I think there's a little bit of rebuttal time left. Thank you, counsel. Thank you very much. Thank you. I'll leave this opportunity for any questions the court might have. Well, the jury did find that this gentleman had the responsibility, of course, of maintaining relationships with the city council and the community as a whole. Now, given that responsibility, what he said about the sheriff, if he is not in a position of policymaker with respect to that, he could continue to say into the future if he were held in that job. And I guess you would have to say that's OK. Well, Your Honor, the responses to the second set of jury interrogatories said that not only did Hunt not cause any disruption by his statements, but if Corona couldn't even reasonably predict that in the future, he might make any disruption to the department. So I think the jury did speak to that point, and they found that there was no likelihood that, from what they knew about the case, that Hunt would, based on that. In other words, that his statements wouldn't lead to disruption now or in the future. And I believe we have evidence in the record indicating that Hunt did a superior job, even during the course of the campaign, with respect to his duties for the city of San Clemente. And I think there was a resolution passed by the city council, the city of San Clemente, during this operative period of time that Hunt did a superior job of delivering law enforcement services to the city of San Clemente. And I think that would be my reaction to that question, Your Honor. All right. So so he had responsibility for maintaining professional relationship. And what you're saying is the jury found that he maintained those professional relationships throughout all this campaign. Yes. Yes. And that resolution is in the record. It was introduced as an exhibit. OK. All right. Thank you, counsel. Hunt v. County of Orange is submitted. And we will take up Powell v. Anheuser-Busch, Incorporated.
judges: Mahan, Leavy, Wardlaw